318 Ga. 169
FINAL COPY

S22G1282. KENNESTONE HOSPITAL, INC. v. EMORY UNVERSITY et al.

PINSON, Justice.

In Georgia, if someone wants to build a hospital or offer new or different health services there, they need a certificate of need ("CON") from the Department of Community Health. See OCGA § 31-6-40. This case is ultimately about whether Windy Hill Hospital ("Windy Hill") needs a CON to change from a long-term care hospital to a short-term care hospital—and if it does, whether that requirement violates the constitutional prohibition against retroactive laws. We granted review, however, to consider only two preliminary questions: First, if a CON authorizes an entity to operate a particular kind of hospital—in this case, a general acute care hospital—has the CON conferred a private right or a public right? And second, did the Court of Appeals apply the proper framework for interpreting certain of the Department's CON regulations?

The first question is relevant to "retroactive law" claims—for example, the hospital's claim here that the Department is applying the CON laws to its existing CON rights in a way that violates our Constitution's prohibition against "retroactive law," Ga. Const. of 1983, Art. I, Sec. I, Par. X. That provision applies only when the rights in question are "vested rights," and only private rights are capable of the kind of vesting that resists retroactive laws. As we explain in detail below, we conclude that a right under a CON to operate a particular kind of hospital is a private right because the right to use one's property in a particular way is a traditional property right, and when conferred by a CON, this right is held by an individual—usually a corporate entity—rather than the public at large.

The second question, although framed in the context of this case, matters every time a court has to interpret and apply an administrative rule to resolve a legal dispute where the agency that promulgated the rule has weighed in about what the rule means. In such cases, "our long-held rule" is that courts may defer to an

agency's construction of its own rule only if the rule's meaning is ambiguous. *City of Guyton v. Barrow*, 305 Ga. 799, 802 (2) (828 SE2d 366) (2019). The only way to know whether the meaning of a rule is ambiguous is to do the work of textual construction, so a court's first step in these cases is simply to construe the text: consider the rule in light of its full legal and historical context and apply the traditional tools of statutory construction to figure out what the relevant language means. That work probably will yield a clear meaning, since "few statutes or regulations . . . are truly ambiguous" after the tools of textual construction run out. Id. at 804 (2). In the rare event that a genuine ambiguity remains, the court must then (and only then) consider whether to settle on the agency's interpretation of the rule.

These answers require us to vacate the Court of Appeals' decision, which held that CONs confer only public rights, and which did not clearly apply the proper framework for interpreting the administrative rules at issue here. Because these answers do not resolve

3

the ultimate questions in this case (and we do not decide any of several other issues that could), we remand the case to the Court of Appeals for further proceedings consistent with this opinion.

1. *Background*

(a) *Certificates of Need*

The CON Act was originally enacted in 1979 to help address the General Assembly's concerns about health care services in Georgia. The Act was meant to ensure that health care services and facilities are "developed in an orderly and economical manner," that "only those health care services found to be in the public interest" are provided, and that health care services are provided "in a manner that avoids unnecessary duplication of services, that is cost effective, that provides quality health care services, and that is compatible with the health care needs of the various areas and populations of the state." OCGA § 31-6-1.

To that end, the CON Act requires "new institutional health service[s]" to obtain a CON. OCGA § 31-6-40 (a). A CON is issued by

4

the Department of Community Health to applicants that satisfy certain statutory considerations, including whether the new health service will serve a population that "has a need for such services," whether "[e]xisting alternatives" could offer the same services in the same area, and whether the proposed new service has a "positive relationship" with existing health care services in the same area. OCGA § 31-6-42 (a) (2), (3), (8).

When the Department awards a CON, it is "valid only for the defined scope, location, cost, service area, and person named in [the] application." OCGA § 31-6-41 (a). Further, the recipient has 12 months to use the CON—that is, to begin to develop the "new institutional health service" proposed in the application—or it lapses. See OCGA § 31-6-41 (b). The Department can revoke a CON for reasons including a failure to comply with the statutory considerations. See OCGA § 31-6-45 (a).

Several different kinds of health care services are considered "new" and therefore require a CON. Among other things, a provider

needs a CON to build a new facility, increase bed capacity in an existing facility, to offer "[c]linical health services" in an existing facility that the facility has not regularly offered within the last 12 months, or convert or upgrade a "general acute care hospital" to a specialty hospital. See OCGA § 31-6-40 (a) (1), (4), (5), (6).

Some facilities and services are exempt from CON requirements. See OCGA § 31-6-47. Health care services that predated the CON Act are not new, so they are "grandfathered." See *HCA Health Svcs., Inc. v. Roach*, 263 Ga. 798, 801 (3) (a) (439 SE2d 494) (1994), overruled in part on other grounds by *Marsh v. Clarke County School Dist.*, 292 Ga. 28, 29-30 (732 SE2d 443) (2012). And the Department can otherwise grant or approve an exemption from CON requirements (as could its predecessor, the State Health Planning Agency). See OCGA §§ 31-6-40 (c) (1), 31-6-47 (b); *Phoebe Putney Mem. Hosp., Inc. v. Roach*, 267 Ga. 619, 620 (1) (480 SE2d 595) (1997).

When an applicant seeks a CON, certain parties can object. The statute allows objections from anyone who "offers substantially

6

similar services as proposed within a 35 mile radius of the proposed project or has a service area that overlaps the applicant's proposed service area," or who "has submitted a competing application in the same batching cycle and is proposing to establish the same type of facility proposed or offers substantially similar services as proposed and has a service area that overlaps the applicant's proposed service area." See OCGA § 31-6-43 (d) (2). Once the Department decides whether to award the CON, "[a]ny party" to the administrative process, other than the Department, can seek judicial review in the superior court. OCGA § 31-6-44.1 (a).

Finally, the CON Act also empowers the Department to "adopt, promulgate, and implement rules and regulations sufficient to administer the provisions of this chapter including the certificate of need program." OCGA § 31-6-21 (b) (4). The statute specifically authorizes the Department to establish "need methodologies for new institutional health services and health care facilities." OCGA § 31-6-21 (b) (8). As explained further below, two of these Department regulations are central to this case.

(b) *This Case*

(i) *Windy Hill's CON History*

Windy Hill opened in the 1970s as a general acute care hospital.[1] At that time, the CON Act had not yet gone into effect, so Windy Hill did not obtain a new CON when it first opened. And when the CON Act went into effect in 1979, Windy Hill was grandfathered, so it did not need to apply for a CON at that time, either. Windy Hill operated as a general acute care hospital until 1996.

In 1996, Windy Hill sought Medicare certification as a long-term care hospital, a process that would involve converting its beds from short-stay use to long-term use. Windy Hill contacted the State Health Planning Agency—the state agency responsible at the time for administering the state certificate of need program—about how the requirements of the CON Act would affect this proposal. Windy

---

[1] WellStar Windy Hill Hospital was originally owned by Cobb County Kennestone Hospital Authority. In 1993, the Hospital Authority leased the hospital to a non-profit corporation, Kennestone Hospital at Windy Hill, Inc. That non-profit corporation later merged into another non-profit, Kennestone Hospital, Inc., which currently owns the hospital and which is the petitioner here.

Hill's communication to the agency has been lost, and its precise contents are unknown. But we do have the agency's response. On June 12, 1996, the State Health Planning Agency wrote in a letter to Windy Hill's counsel that the hospital would not need a CON to convert to a long-term care hospital. The agency wrote:

> After considering all of the information made available to the Agency, please be informed that Windy Hill will not need to obtain CON approval in order to implement its proposal as it was described to the Agency. In particular, it should be noted that the Agency is of the opinion that the operation of Windy Hill as a long-term acute care hospital is within the original scope of Windy Hill's CON authorization as a general acute care hospital.

Relying on the agency's letter, Windy Hill transitioned to long-term care. On July 1, 1997, it obtained certification as a long-term care hospital from the Department of Human Resources, the state agency responsible at the time for hospital licensing. Ever since, Windy Hill has operated as a long-term care hospital.

(ii) *The Department's Decisions*

Decades later, Windy Hill contemplated a transition back to short-term care. As part of the transition process, Windy Hill asked

9

the Department to confirm that, if the hospital relinquished its Medicare certification as a long-term care hospital, its beds would automatically "revert" to their pre-1996 status as acute short-stay beds. In other words, Windy Hill hoped to confirm that it could transition to short-term care without applying for and obtaining a new CON. The transition was opposed by two hospitals owned by one of the respondents here, Emory University, who filed an objection.

Windy Hill's request for a determination to transition to short-term care cited two of the Department's administrative rules. The first rule sets out "Specific Review Considerations for Short-Stay General Hospital Beds":

> A hospital that has been *approved through the Certificate of Need process* to use a certain number of short-stay hospital beds for long-term acute care ("LTAC") beds shall have such LTAC beds removed from the official inventory of available short-stay beds once the LTAC is certified by Medicare; provided, however, that such beds will revert to the hospital's official inventory of available short-stay beds at any point that the LTAC ceases operation or is no longer certified by Medicare.

Ga. Comp. R. & Regs. r. 111-2-2-.20 (1) (d) (emphasis added). The second rule contains "Specific Review Considerations for Long Term

10

Care Hospitals":

> [A] hospital that has been *approved through the Certificate Of Need process* to use all of its short-stay beds for a Freestanding [Long Term Care Hospital ("LTCH")] shall have such beds removed from the official inventory of available short-stay beds when the LTCH is certified by Medicare; provided, however, that the hospital's beds will revert to the official inventory of available short-stay beds at any point that the facility ceases to be certified by Medicare as an LTCH.

Ga. Comp. R. & Regs., r. 111-2-2-.36 (2) (d) (emphasis added). Both rules were promulgated after the hospital converted to long-term care in 1996.

The Department denied Windy Hill's request. At three separate levels of administrative review, the Department concluded that Windy Hill was not eligible for the automatic reversion described in its rules because the hospital converted to long-term care in 1996 without having been "approved through a CON process." The Department's initial decision found simply that the hospital's 1996 conversion was "not subject to prior CON review and approval." On administrative appeal, a hearing officer found that the State Health Planning Agency's 1996 letter—which advised Windy Hill that it

11

would "not need to obtain CON approval" to convert to long-term care—was not a "CON process," but rather a "determination that [Windy Hill] did not need a CON to convert to an LTCH" at that time. The hearing officer reasoned that Windy Hill "permissibly avoided rather than underwent, much less was 'approved through,' a CON process." And in the final level of administrative review, a designee of the Department's Commissioner agreed with the hearing officer that the hospital "permissibly avoided," rather than went through, the CON approval process. The upshot of the agency's decision was that Windy Hill would need to obtain a new CON to operate as a new short-term care hospital.

(iii) *Superior Court Review*

Windy Hill sought judicial review in the Superior Court of Cobb County, and the superior court reversed the final agency decision. The court found that Windy Hill had "engaged in 'the CON process' prior to its 1997 conversion to LTCH status by seeking a determination from SHPA ([Department's] predecessor agency) regarding its CON authority to operate long-term beds." The superior court also

concluded that the Department's decision violated Windy Hill's constitutional rights, because the hospital had acquired a "vested right to provide both short-stay and long-term medical surgical care" that could not be impaired by later-enacted legislation.

(iv) *Court of Appeals Decision*

Emory and the Department appealed the superior court's decision, and the Court of Appeals reversed. See *Emory Univ. v. Kennestone Hosp., Inc.*, 364 Ga. App. 583 (876 SE2d 21) (2022).

In its opinion reversing the superior court, the Court of Appeals began by noting that when an agency decision is subject to judicial review, the court should defer to the agency's interpretation of the rules and regulations it has enacted, and that when a court construes those administrative rules and regulations, "the ultimate criterion is the administrative interpretation." *Emory Univ.*, 364 Ga. App. at 589 (2) (b) (i) (cleaned up). The court explained that this deference is due because "agencies provide a high level of expertise and an opportunity for specialization unavailable in the judicial or legislative branches." Id. (cleaned up). The court later clarified that this

deference applies only "*so long as* that interpretation is consistent with the [agency's enabling] statute." Id. at 592 (2) (b) (ii) (B) (citation omitted; emphasis in original).

The court concluded that the Department's "interpretation [of its own rules] correctly reflects the plain language of the [CON] statute and comports with the legislative intent." *Emory Univ.*, 364 Ga. App. at 592 (2) (b) (ii) (B) (citation and punctuation omitted). Relevant here, the court examined the Department's determination that Windy Hill had not gone through a "CON process." To determine what a "CON process" is, the court looked to its own precedent. Under that precedent, a CON process is "a system of mandatory review requiring that, before new institutional health services and facilities can be developed, the developer must apply for and receive a CON from the [Department]." Id. at 590 (2) (b) (ii) (B) (citation and punctuation omitted). But the court explained that none of that had happened here. Windy Hill never applied for a CON, and there was no ensuing review. See id. at 590-591 (2) (b) (ii) (B). To the contrary, the State Health Planning Agency's 1996 letter expressly stated that

14

Windy Hill did *not* need to participate in a CON process at that time. Id. So, the court concluded, Windy Hill could not take advantage of the "reversion[s]" in the Department's regulations. Id. at 592 (2) (b) (iii).

The Court of Appeals also concluded that Windy Hill did not have a "vested right" to a certificate of need to provide short-term hospital services. *Emory Univ.*, 364 Ga. App. at 596-599 (4). The court explained that only private rights could be protected as vested rights, but suggested that Windy Hill's right to a CON was a public right because the CON Act was "enacted for the protection of the public, and not for the benefit of any particular individual or calling." Id. (citation and punctuation omitted). And public rights, because they do not vest, can be modified by later-enacted laws or regulations. See id. at 597 (4). From its conclusion that Windy Hill's CON was a public right, it followed that Windy Hill's "grandfathered" right to operate as a short-term care hospital was not a vested right, and the hospital "relinquished" that right in 1996 when it transitioned to a long-term care hospital. See id. at 597-598 (4). As

15

a result, the court concluded that applying later-enacted statutory and regulatory conditions on the hospital's ability to go back to providing short-term care did not retroactively impair any vested rights in violation of Windy Hill's constitutional rights. See id. at 599 (4).

We granted review of the Court of Appeals' decision to consider (1) whether a hospital's authorization under the CON program to operate as a general acute-care hospital is a private right or a public right, and (2) whether the Court of Appeals applied the proper standard for reviewing the Department's interpretation of administrative rules governing the CON process. We address these questions in turn.

2. (a) Our Constitution forbids applying laws retroactively when doing so would impair "vested rights." See Ga. Const. of 1983, Art. I, Sec. I, Par. X; *Deal v. Coleman*, 294 Ga. 170, 175 (2), 176 (2) (a) (751 SE2d 337) (2013). Not all kinds of interests are rights capable of vesting. Speaking generally, rights capable of vesting include only those "interests which it is proper for the state to recognize and

protect and of which the individual cannot be deprived arbitrarily without injustice." *Coleman*, 294 Ga. at 177 (2) (a) (quoting *Hayes v. Howell*, 251 Ga. 580, 584 (2) (b) (308 SE2d 170) (1983)). And we have identified two important characteristics that set rights capable of vesting apart from other interests which may properly be impaired by retroactive legislation. First, vested rights include only *substantive* rights: "there are no vested rights in any course of procedure." See *Coleman*, 294 Ga. at 177 (2) (a) (quoting *Mason v. Home Depot U.S.A., Inc.*, 283 Ga. 271, 278 (4) (658 SE2d 603) (2008) (punctuation omitted)). Second—and our focus here—vested rights include only private rights, not public rights. *Coleman*, 294 Ga. at 181 (2) (a) ("[W]e conclude that 'vested rights' must be private rights, and public rights—those rights that belong to the People in common—can be modified by the elected representatives of the People prospectively or retroactively, as they see fit.").

The distinction between private rights and public rights has long been a meaningful one in our law. See *Coleman*, 294 Ga. at 178 (2) (a); *Sons of Confederate Veterans v. Henry County Bd. of*

17

*Commrs.*, 315 Ga. 39, 47-48 (2) (a) (880 SE2d 168) (2022) (addressing differences in standing requirements that turn on whether the plaintiff seeks to vindicate a private right or a public right). See also, e.g., *Oil States Energy Svcs. v. Greene's Energy Group*, 584 U.S. 325, 334 (III) (138 SCt 1365, 200 LE2d 671) (2018) (explaining that "[w]hen determining whether a proceeding involves an exercise of Article III judicial power, [the United States Supreme] Court's precedents have distinguished between 'public rights' and 'private rights,'" and noting that Congress may "assign adjudication of public rights to entities other than Article III courts").[2] This history does not mean a definitive line between these categories is easily drawn,[3]

---

[2] The distinction between private and public rights can be traced at least as far back as the English common law. Sir William Blackstone, "whom we have long accepted as the leading authority on the common law," see *Sons of Confederate Veterans*, 315 Ga. at 48 (2) (a), explained in his Commentaries on the Laws of England that the "wrongs" the law redressed were "divisible into" "private wrongs" and "public wrongs." 3 William Blackstone, Commentaries *2. Private wrongs were "an infringement or privation of the private or civil rights belonging to individuals, considered as individuals," while public wrongs—a category made up of "crimes and misdemeanors"—were "a breach and violation of public rights and duties, which affect the whole community, considered as a community." Id.

[3] The case law and scholarship wrestling with how to define these cate-

but the core of each category is relatively clear.

As a general matter, public rights are those "shared by the People in common." *Coleman*, 294 Ga. at 179 (2) (a). Classic examples include the public's shared rights to navigate public waters and use public highways. See *Lansing v. Smith*, 4 Wend. 9, 21 (N.Y. Sup. Ct. of Errors 1829).[4] See also *County Commrs. v. Chandler*, 96 U.S. 205,

gories is substantial. See, e.g., *Coleman*, 294 Ga. at 178 (2) (a); *Sons of Confederate Veterans*, 315 Ga. at 47-49 (2) (a); *Oil States*, 584 U.S. at 334 (III) (explaining that the United States Supreme Court "has not 'definitively explained' the distinction between public and private rights, and its precedents applying the public-rights doctrine have 'not been entirely consistent'") (citations omitted); *Atlas Roofing Co., Inc. v. Occupational Safety and Health Review Comm.*, 430 U.S. 442 (97 SCt 1261, 51 LE2d 464) (1977); *Crowell v. Benson*, 285 U.S. 22, 51 (2) (52 SCt 285, 76 LE 598) (1932); John M. Golden & Thomas H. Lee, Federalism, Private Rights & Article III Adjudication, 108 Va. L. Rev. 1547 (2022) (exploring the difference in justiciability between private and public rights with respect to federalism and the separation of powers); Caleb Nelson, Vested Rights, "Franchises," and the Separation of Powers, 169 U. Pa. L. Rev. 1429 (2021) (reviewing the history of private versus public rights in the context of defining government franchises); Adam J. MacLeod, Public Rights After *Oil States Energy*, 95 Notre Dame L. Rev. 1281 (2020); Ann Woolhandler & Caleb Nelson, Does History Defeat Standing Doctrine?, 102 Mich. L. Rev. 689 (2004) (discussing the distinction between public and private rights as it relates to the evolution of the standing doctrine); Ann Woolhandler, Public Rights, Private Rights, and Statutory Retroactivity, 94 Geo. L. J. 1015 (2006) (considering private and public rights as they relate to retroactive legislation).

[4] As we noted in *Coleman*, the United States Supreme Court has described *Lansing* as a leading case and relied on its description of public and private rights in interpreting the federal Constitution. See *Coleman*, 294 Ga. at 178 (2) (a) n.16 (citing *Appleby v. New York*, 271 U.S. 364, 381-382 (46 SCt 569, 70 LE 992) (1926)). Although the Court's decisions are not binding as to

208 (2) (24 LE 625) (1877) ("Railroads, turnpikes, bridges, ferries, are all things of public concern, and the right to erect them is a public right."). The right to enforce compliance with penal law, too, is traditionally understood as vindicating "violations of public rights and duties," *Sons of Confederate Veterans*, 315 Ga. at 48 (2) (a) (citing 3 William Blackstone, Commentaries *2). See also Ann Woolhandler & Caleb Nelson, Does History Defeat Standing Doctrine?, 102 Mich. L. Rev. 689, 693 (I) (A) (2004) ("The penal law (which includes not only criminal law but also fines and forfeitures recoverable through civil process) also defines various public rights." (citing 4 Blackstone, Commentaries *5)). And so are the proprietary rights held by government on behalf of the people, like title to public lands and ownership of funds in the public treasury. See, e.g., *Spokeo, Inc. v. Robins*, 578 U.S. 330, 345 (I) (A) (136 SCt 1540, 194 LE2d 635) (2016) (Thomas, J., concurring) (indicating that "disputes over the

questions of Georgia law, we may properly consider such decisions, which address the same common-law-based distinction between public and private rights that informs our understanding of vested rights, as persuasive authority.

20

use of public lands" implicate public rights); *Den ex dem. Murray v. Hoboken Land and Improvement Co.*, 59 U.S. 272, 283 (15 LE 372) (1855) (describing "the recovery of public dues by a summary process of distress" as the redress of a "public wrong"). See also Ann Woolhandler, Public Rights, Private Rights, and Statutory Retroactivity, 94 Geo. L. J. 1015, 1020-1021 (I) (B) (2006) ("Retroactivity"). Finally, this Court has held that the right of access to public records—a right "unknown at common law," *Coleman*, 294 Ga. at 183 (2) (b), and conferred by statute to all citizens "solely by reference to their membership in the People," id. at 181 (2) (b)—is a public right. In short, public rights generally include those interests that enjoy legal protection but belong to "the whole community, considered as a community." *Sons of Confederate Veterans*, 315 Ga. at 48 (2) (a) (quoting 3 Blackstone, Commentaries *2).[5]

---

[5] Our precedent before *Coleman* "[did] not expressly employ this distinction [between public and private rights] with respect to retroactive legislation." *Coleman*, 294 Ga. at 180 (2) (a). But we recognized in *Coleman* that the "settled distinction in American law between public and private rights" is "consistent with Georgia law," and that "a few of our precedents at least hint at the distinction." Id. at 180-181 (2) (a).

Private rights, by contrast, "belong[ ] to an individual as an individual." *Sons of Confederate Veterans*, 315 Ga. at 47 (2) (a). We have said that this category "traditionally [has] been understood to refer to 'an individual's common law rights in property and bodily integrity, as well as in the enforcement of contracts.'" *Coleman*, 294 Ga. at 183 (2) (b) (quoting Woolhandler, Retroactivity, supra, at 1020 (I) (B)). At common law, the rights of "personal security," "personal liberty," and "private property" in particular were described as "absolute," not because they could not be regulated, but because they "appertain[ed] and belong[ed] to particular men[ ] merely as individuals," not "incident to them as members of society, and standing in various relations to each other." 1 Blackstone, Commentaries *123, 129. See Caleb Nelson, Adjudication in the Political Branches, 107 Colum. L. Rev. 559, 567 (I) (A) (1) (2007) (explaining how these are traditionally understood as "core" private rights). And Georgia law has long treated these kinds of rights, as well as contractual rights, as private rights. Cf. *Dept. of Transp. v. City of Atlanta*, 255 Ga. 124, 130 (3) (a) (337 SE2d 327) (1985) (noting the constitutional limits

placed on the state's right of eminent domain by "the individual citizens' right to own property"); *Layer v. Barrow County*, 297 Ga. 871, 872 (1) (778 SE2d 156) (2015) (referring to "private rights under a contract") (citation and punctuation omitted). Whatever the contours of the category of private rights, these particular rights—rights of personal liberty and security, private property, and contract—sit firmly within it.

(b) With these basic categories of public and private rights in mind, we can now turn to the question presented here: whether a CON's authorization to operate as a general acute care hospital confers any private rights on the recipient. We conclude that it does because the right to use one's property in a particular way (here, as a particular kind of hospital) is an individual property right with roots in the common law—that is, a kind of right that sits at the core of the category of private rights.

That such an authorization under a CON confers a property right is apparent from the CON statute itself and the nature of the right conferred. The statute tells us that a CON authorizes its holder

23

to convert the holder's property from a hospital that does not offer general acute care to one that does, see OCGA § 31-6-40 (a) (5), and it ties that authorization to the "location" specified in the CON application, see OCGA § 31-6-41 (a). Put plainly, this authorization allows the holder to offer and perform a particular kind of care at its hospital—or even more plainly, to use its property in a particular way. It is hornbook law that property is a set of "rights of the owner in relation to land or a thing" that includes "the right of a person to possess, use, enjoy and dispose of it . . . ." *Rabun County v. Mountain Creek Estates, LLC*, 280 Ga. 855, 856-857 (1) (632 SE2d 140) (2006) (citation and punctuation omitted). See also, e.g., Daniel F. Hinkel, Pindar's Georgia Real Estate Law & Procedure § 1:1 (7th ed. 2023) ("Land ownership is often described as a bundle of rights, powers and privileges such as the right of possession, the right to exclude others, the privilege of using or not as desired, and the right and power to sell or otherwise dispose of it." (footnotes omitted)). And this understanding of property rights is firmly rooted in the common law, under which the right to private property was said to comprise

"the free use, enjoyment, and disposal of all his acquisitions, without any control or diminution, save only by the laws of the land." 1 Blackstone, Commentaries *138.

The CON statute also makes clear that, like other private rights, these property rights are granted to an individual person, not the public.[6] A CON is sought by the "person" who seeks to develop or use their property for a new health care service or facility, OCGA § 31-6-40 (b), and when issued, a CON is not only tied to the "location" specified in the application but also "valid only for" the person who applied for it. OCGA § 31-6-41 (a); see Ga. Comp. R. & Regs. r. 111-2-2-.02 (3). And if the CON-authorized facility is acquired by another person, the CON transfers to that person. See OCGA § 31-6-41 (a) (explaining that when a CON "owned by an existing health care facility is transferred to a person who acquires such existing facility," the CON "shall be valid for the person who acquires such a

---

[6] The terms "individual" and "person" are used here in their legal sense, and thus include both natural persons and corporations—which, as here, are often the applicants and holders of CONs. See, e.g., *Eckles v. Atlanta Technology Group, Inc.*, 267 Ga. 801, 803 (2) (485 SE2d 22) (1997) (corporations are artificial persons).

25

facility and for the scope, location, cost, and service area approved by the department"). In short, when a CON confers the kind of property rights that were well known at common law, it confers those rights on individuals, not the public at large. Those ingredients are the recipe for private rights. See *Coleman*, 294 Ga. at 178-179 (2) (a), 183 (2) (b) (explaining that private rights "may become vested in particular persons" and "traditionally have been understood" to include "an individual's common law rights in property") (cleaned up).

Emory takes a different view of the rights conferred by a CON. It points out that a CON is issued by the Department, and it is a creature of a complex statutory scheme that imposes restrictions, and confers benefits—like the ability to object to proposed CONs within a geographic area—that have no analog in traditional property rights. On the restrictions side, Emory notes that the use and development rights conferred by a CON, unlike traditional property rights, can lapse after a year of nonuse, see OCGA § 31-6-41 (b), and the CON may be revoked by the State for any number of reasons, see OCGA § 31-6-45 (a). As for benefits, Emory explains that a CON

26

also confers on the holder an "anti-competitive" right to oppose a potential competitor's application for a CON. See OCGA § 31-6-43 (d) (2). Given such features and the "public purpose" of the CON laws, Emory contends that any "rights" conferred by a CON can only be understood as public rights.

These individual points may be true as far as they go, but none supports the conclusion that CONs confer no private rights. Take first the point that these rights are conferred by the State. This distinction might matter if the things conferred—here, certain rights to develop and use one's property—are not so plainly traditional property rights. Certain "privileges" or "franchises" that originate with and are granted by the State may be considered public rights even when held by individuals. Compare, e.g., *Oil States*, 584 U.S. at 335 (III) (A) (1) (holding that the grant of a patent is a matter involving public rights because patents are "public franchises" that give the patent owner a right to exclude that "did not exist at common law" and is a "creature of statute law" (cleaned up)). But the use and development rights conferred by a CON are not those

27

things. Absent the CON Act, such rights would simply be part of the bundle of common law property rights held by the property owner. See, e.g., *Mountain Creek Estates*, 280 Ga. at 856-857 (1). When a CON is issued, those rights that have been restricted by the CON Act are in effect restored to the property owner, at least in part. In other words, when a CON authorizes a hospital to offer a particular kind of care, it is not granting a new privilege granted by the State— it is restoring to the owner in a limited fashion an existing property right that the State has otherwise restricted. That these rights were restored by the State does not change their nature as private property rights.

This understanding bears out in our decisions addressing vested rights. In several of those decisions, we have classified as vested rights certain property rights that, similar to the rights at issue here, were restricted and then restored by the government. See, e.g., *Southern States-Bartow County, Inc. v. Riverwood Farm Homeowners Assn.*, 300 Ga. 609, 612 (797 SE2d 468) (2017) (recog-

nizing that landowner had vested right in nonconforming use); *Fulton County v. Action Outdoor Advert., JV, LLC*, 289 Ga. 347, 349 (1) (711 SE2d 682) (2011) (landowners had vested individual rights to consideration of applications for permits to construct billboards on their property); *WMM Props., Inc. v. Cobb County*, 255 Ga. 436, 438 (1) (b) (339 SE2d 252) (1986) (landowner had vested right to develop property as authorized by zoning regulations in force when plans were approved). Most of these decisions were issued before we expressly recognized the public/private rights distinction as one that mattered to the question whether a right was capable of vesting, see *Coleman*, 294 Ga. at 180-181 (2) (a), so we did not identify the vested rights in those cases as private rights. Still, recognizing the restored property rights conferred by a CON as private rights capable of vesting is at least consistent with these past decisions recognizing similar government-conferred rights as vested rights.

Emory also points out that CONs are part of a comprehensive regulatory scheme that places restrictions or limitations on the rights conferred by a CON. But those restrictions do not change the

29

nature of the rights that are conferred. As we have just discussed, those rights include traditional property rights, including the rights to develop and use one's property in a particular way. Even outside the context of CONs, such property rights are subject to all kinds of government regulations. Our government is charged with "[p]rotection to person and property" as its "paramount duty," Ga. Const. of 1983, Art. I, Sec. I, Par. II, and regulatory schemes are one tool for carrying out that duty. Building codes, environmental laws, and zoning ordinances (to name just a few) place any number of restrictions on an owner's rights to develop and use its property. Yet no one would say that the presence of these kinds of regulatory schemes changes the private property rights they regulate into something other than "property rights." Even at common law, it was understood that property rights were held subject to "the laws of the land," 1 Blackstone, Commentaries *138, yet we are not aware of any indication from the common law that the rights in question were any less rights of property because they were subject to such regulation. Indeed, were it otherwise (as Emory contends), private rights could

be "converted" into public rights any time the government were heavy-handed enough in regulating. That understanding of the effect of regulation on private rights would gut, and thus cannot be reconciled with, the longstanding and meaningful protection of private rights under our law. See, e.g., Ga. Const. of 1983, Art. I, Sec. I, Par. II; *Coleman*, 294 Ga. at 177 (2) (a); 1 Blackstone, Commentaries *123, 129. In short, notwithstanding the limitations on the rights conferred by a CON that Emory identifies, they remain, in substance, rights to develop property that are held by individuals—characteristics that mark them as private rights. See *Coleman*, 294 Ga. at 183 (2) (b).

As for Emory's benefits point, it is true enough that a CON confers a kind of advocacy right on the holder that does not look like a traditional property right. But Emory does not dispute that a CON also authorizes the holder to use and develop its property in a particular way, and that remains a classic property right. Even if the advocacy right conferred on a CON holder were better understood as a public right (something we need not decide here), we do not see

how the conferral of that right changes the nature of the separately conferred rights to use one's property in a particular way. Put another way, a CON confers a set of related-but-distinct rights to its holder. The possibility that one of those rights may be a public right does not mean that all of the rights conferred must fall into the same category.

Finally, both Emory and the Department place significant weight on the public "nature" and "purpose" of the CON Act. But presumably every law serves a public purpose. See Ga. Const. of 1983, Art. I, Sec. II, Par. I ("All government, of right, originates with the people, is founded upon their will only, and is instituted solely for the good of the whole."). So the uncontroversial proposition that the CON Act is supposed to serve the public interest can hardly answer the question whether any rights conferred by a CON are public or private rights. Instead, as we explained in *Coleman*, that question turns on "the nature of the right" and "to whom it is afforded." *Coleman*, 294 Ga. at 178 (2) (a). And as we have explained, a CON's authorization to operate as a general acute care hospital confers use

32

and development rights that are in the nature of property rights conferred on individuals, which means that such an authorization confers private rights.

(c) That, however, is all we decide here. As noted above, we do not decide whether any advocacy or other non-property-based rights conferred by a CON are private rights. We also do not decide any of several other issues that could be dispositive of this case, including whether Windy Hill ever held a CON to operate as a long-term care hospital, whether the hospital's correspondence with the State Health Planning Agency in 1996 was a "CON process," whether any rights purportedly conferred by a CON ultimately vested, or whether applying the cited rules to Windy Hill as the Department did would unconstitutionally impair any vested rights. Such questions are left to be answered on remand as needed.

3. In *Barrow*, 305 Ga. at 801-804 (2), we clarified the framework for interpreting administrative rules. As that decision makes clear, although our past decisional law has said that courts may defer to an agency's interpretation of its own rules, id. at 801 (2) (citing

33

*The Atlanta Journal & The Atlanta Constitution v. Babush*, 257 Ga. 790, 792 (2) (364 SE2d 560) (1988)), such deference will be warranted only in rare cases. This is because "our long-held rule" is that courts may defer to an agency's construction of its own rule only if its meaning is ambiguous, *Barrow*, 305 Ga. at 802 (2), and once the traditional tools of construction are applied, "few statutes or regulations . . . are truly ambiguous," id. at 804 (2).[7]

*Barrow* thus yields a straightforward framework for interpreting administrative rules. First, construe the relevant text: consider the regulatory text in light of its full legal and historical context and otherwise apply the traditional tools of statutory construction to figure out what the rule means. See 305 Ga. at 802-803 (2), 805 (3). If

---

[7] In *Barrow*, we declined to decide whether to reconsider our precedent calling for deference to an agency's interpretation of one of its rules when the rule is genuinely ambiguous because the rule in that case was not ambiguous. See *Barrow*, 305 Ga. at 804 (2). We have declined to answer that question again since then. See *Premier Health Care Investments, LLC v. UHS of Anchor, L.P.*, 310 Ga. 32, 38 (3) (a) n.5 (849 SE2d 441) (2020) (declining to defer to agency interpretation of statute after applying canons of statutory construction and concluding that the statute was not ambiguous and observing that, "like in [*Barrow*], this case does not present the question of whether [the Court's deference] case law should be reconsidered"). We need not and do not reach that question in this case, either.

this work produces a clear meaning—and as we said in *Barrow*, it probably will, see id. at 804 (2)—that is the end of the matter. If, on the other hand, a genuine ambiguity remains after "all tools of construction" are "exhausted"—that is, the court is left with two (or more) equally reasonable interpretations—the court must then consider whether to defer to the agency's interpretation of the rule. See id. at 802-803 (2).[8]

---

[8] Our past decisions have indicated that even when a rule is ambiguous, other factors have mattered for whether an agency's interpretation is entitled to deference, such as whether the agency promulgated the rule "to fulfill the function given it by the legislative branch," *Pruitt Corp. v. Ga. Dept. of Cmty. Health*, 284 Ga. 158, 159 (2) (664 SE2d 223) (2008), whether the rule has "undergone the scrutiny afforded a statute during the legislative process or the adoption process through which all rules and regulations must pass," id. at 159-160 (2) (citing OCGA § 50-13-4), and whether the agency's interpretation resolves the ambiguity on "terms that are reasonable in light of the statutory text." *New Cingular Wireless PCS v. Ga. Dept. of Revenue*, 303 Ga. 468, 473 (2) (813 SE2d 388) (2018) (quoting *Tibbles v. Teachers Retirement Sys. of Ga.*, 297 Ga. 557, 558-559 (1) (775 SE2d 527) (2015)). And there may be other proper reasons to decline to defer. See, e.g., *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155 (II) (A) (132 SCt 2156, 183 LE2d 153) (2012) (explaining that "deference is likewise unwarranted when there is reason to suspect that the agency's interpretation does not reflect the agency's fair and considered judgment on the matter in question," as when "the agency's interpretation conflicts with a prior interpretation," or when "it appears that the interpretation is nothing more than a convenient litigating position" or a "post hoc rationalization" of past agency action (cleaned up)). We need not consider other such factors to resolve this case, so we do not.

Although *Barrow* was issued before the Court of Appeals' opinion here, it is not clear whether the Court of Appeals applied its framework. The interpretive question before the Court was whether Windy Hill had "been *approved through the Certificate of Need process*" to convert its short-stay beds to long-term care, such that certain Department rules would allow the hospital to transition back to short-term care. *Emory Univ.*, 364 Ga. App. at 589-590 (2) (b) (ii) (A) (emphasis in original; citing Ga. Comp. R. & Regs., rr. 111-2-2-.20 (1) (d) and 111-2-2-.36 (2) (d)). In addressing that question, the Court of Appeals began by quoting Court of Appeals decisions that predated *Barrow* and invoked deference to the agency's interpretation as the rule, rather than a step to consider only if the relevant text is truly ambiguous. See *Emory Univ.*, 364 Ga. App. at 589 (2) (b) (i) (citing *ASMC, LLC v. Northside Hosp., Inc.*, 344 Ga. App. 576, 582 (810 SE2d 663) (2018)) (noting that "judicial deference is to be afforded the agency's interpretation of rules and regulations it has enacted" so that the "ultimate criterion is the administrative interpretation"); *Cobb Hosp., Inc. v. Dept. of Cmty. Health*, 349 Ga. App. 452,

460 (1) (c) (ii) (825 SE2d 886) (2019) (explaining that "agencies provide a high level of expertise" and cautioning that "their decisions are not to be taken lightly or minimized by the judiciary" (cleaned up)). Moreover, the court's analysis does not appear to include the construction of the relevant language that would allow the court to determine whether that language was ambiguous or not. That said, the court also stated that "we employ the basic rules of statutory construction and look to the plain meaning of the regulation to determine its meaning," *Emory Univ.*, 364 Ga. App. at 588-589 (2) (b) (i) (cleaned up), and its conclusion that Windy Hill had not gone through a "CON process" was couched in terms of the "plain language of the relevant rules and statutes," id. at 588 (2) (b).

Because it is not clear that the Court of Appeals applied the proper framework for interpreting the administrative rules at issue here, we do not express an opinion as to whether its ultimate conclusion that these rules require Windy Hill to seek a new CON is correct. Instead, we leave it to the Court of Appeals on remand to apply the proper framework to resolve that interpretive question in

the first instance. See, e.g., *Efficiency Lodge, Inc. v. Neason*, 316 Ga. 551, 567 (3) (889 SE2d 789) (2023) ("Because we are generally a court of review, we leave it to the trial court in the first instance to apply the legal framework we have set out here to the facts of this case.").

*Judgment vacated and case remanded with direction. All the Justices concur.*

Decided February 6, 2024.

Certiorari to the Court of Appeals of Georgia — 364 Ga. App. 583.

*Moore Ingram Johnson & Steele, Robert D. Ingram, David P. Conley; The Weil Firm, Amy L. Weil; Parker Hudson Rainer & Dobbs, Armando L. Basarrate, David B. Darden, Grace P. Blood*, for appellant.

*Morris Manning & Martin, Robert C. Threlkeld, Elliot L. Coward; Christopher M. Carr, Attorney General, Margaret K. Eckrote, Deputy Attorney General, Jeffrey W. Stump, Senior Assistant Attorney General, Charles K. Thimmesch, James E. Barrett, Cathelynn Tio, Assistant Attorneys General; Stephen J. Petrany, Solicitor-General; Stacey A. Hillock*, for appellee.