**FIRST DIVISION
BARNES, P. J.,
BROWN and HODGES, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules**

**September 18, 2024**

# In the Court of Appeals of Georgia

A22A0111. EMORY UNIVERSITY d/b/a EMORY UNIVERSITY HOSPITAL SMYRNA et al. v. KENNESTONE HOSPITAL, INC. d/b/a WELLSTAR WINDY HILL HOSPITAL.

A22A0112. GEORGIA DEPARTMENT OF COMMUNITY HEALTH v. KENNESTONE HOSPITAL, INC. d/b/a WELLSTAR WINDY HILL HOSPITAL.

HODGES, Judge.

In *Emory Univ. v. Kennestone Hosp.*, 364 Ga. App. 583 (876 SE2d 21) (2022) ("*Emory I*"), we concluded that Kennestone Hospital, Inc. d/b/a WellStar Windy Hill Hospital's ("Windy Hill") proposed conversion of its status from an authorized and permitted long-term care hospital to a short-stay general acute care hospital required a new certificate of need ("CON"). See OCGA § 31-6-40 et seq. (the "CON

Act"). In particular, relying upon OCGA § 31-6-1[1] and *Deal v. Coleman*, 294 Ga. 170 (751 SE2d 337) (2013),[2] we determined that Windy Hill "did not have a vested right to remain a general acute care hospital throughout its operation as a long-term care hospital" because the CON Act constituted a public right that was "enacted for the protection of the public, and not for the benefit of any particular individual or calling." (Citation and punctuation omitted.) *Emory I*, 364 Ga. App. at 596 (4), 597 (4). As a result, we reversed the Superior Court of Cobb County's judgment granting Windy

---

[1] "The policy of this state and the purposes of this chapter are to ensure access to quality health care services and to ensure that health care services and facilities are developed in an orderly and economical manner and are *made available to all citizens* and that only those health care services found to be in the public interest shall be provided in this state." (Emphasis supplied.) Compare *Kennestone Hosp. v. Emory Univ.*, 318 Ga. 169, 178 (2) (a) (897 SE2d 772) (2024) ("*Emory II*") ("[P]ublic rights generally include those interests that enjoy legal protection but belong to *the whole community, considered as a community*.") (citation and punctuation omitted; emphasis supplied).

[2] See *Deal*, 294 Ga. at 181 (2) (a) (defining "public rights" as "those rights that belong to the People in common [and] can be modified by the elected representatives of the People prospectively or retroactively, as they see fit"), 182-183 (2) (b) (noting that "the intent of the General Assembly in enacting the Open Records Act was to *afford the public at large access* to public records") (citation and punctuation omitted; emphasis in original and supplied); see also *Bullard v. Holman*, 184 Ga. 788, 791 (2) (193 SE 586) (1937) (holding that act requiring trade name registration was "*enacted for the protection of the public*, and not for the benefit of any particular individual or calling") (emphasis supplied); compare *Emory II*, 318 Ga. at 178 (2) (a).

2

Hill's petition for judicial review in Case No. A22A0111 and dismissed Case No. A22A0112 as moot.[3]

The Supreme Court of Georgia granted Windy Hill's petition for certiorari, vacated our opinion in *Emory I*, and remanded the cases to this Court in *Kennestone Hosp. v. Emory Univ.*, 318 Ga. 169 (897 SE2d 772) (2024) ("*Emory II*") for reconsideration in view of its determination that "a right under a CON to operate a particular kind of hospital is a private right. . . ." Id. Accordingly, we have two tasks. First, we consider whether the superior court erred in finding that Windy Hill had a "vested right to provide both long-term and short-stay medical-surgical care . . . while retaining its status as a general acute care hospital[,]" and that reversing the Department of Community Health (the "DCH") commissioner's decision "avoids an unconstitutional result," in view of the Court's determination that the "right under a CON to operate a particular kind of hospital is a private right[.]" *Emory II*, 318 Ga. at 169. Second, we analyze the DCH's CON Rules and Regulations, as applicable to these cases, under the framework prescribed by *City of Guyton v. Barrow*, 305 Ga.

---

[3] Case No. A22A0112 is comprised of the Department of Community Health's cross-appeal.

799 (828 SE2d 366) (2019). See *Emory II*, 318 Ga. at 183-184 (3) (reciting *Barrow*'s "straightforward framework for interpreting administrative rules") .

Having done so, we now conclude that the CON Rules and Regulations are unambiguous and that Windy Hill must obtain approval through the CON process to operate a short-stay acute care hospital. We likewise conclude that, after consideration of the Court's holding in *Emory II*, Windy Hill did not secure a vested right to operate a short-stay acute care hospital; it follows that the DCH did not violate a purported vested right by requiring Windy Hill to obtain a new CON to operate a short-stay acute care hospital because the only vested right Windy Hill arguably acquired was to operate a long-term care hospital. Accordingly, we again reverse the superior court's judgment in Case No. A22A0111 and dismiss Case No. A22A0112 as moot.

1. (a) *Factual Background*. In *Emory II*, the Supreme Court stated[4] that

Windy Hill opened in the 1970s as a general acute care hospital. At that time, the CON Act had not yet gone into effect, so Windy Hill did not obtain a new CON when it first opened. And when the CON Act went into effect in 1979, Windy Hill was grandfathered, so it did not need to

---

[4] See OCGA § 9-11-60 (h) ("[A]ny ruling by the Supreme Court or the Court of Appeals in a case shall be binding in all subsequent proceedings in that case in the lower court and in the Supreme Court or the Court of Appeals as the case may be.").

apply for a CON at that time, either. Windy Hill operated as a general acute care hospital until 1996.

In 1996, Windy Hill sought Medicare certification as a long-term care hospital, a process that would involve converting its beds from short-stay use to long-term use. Windy Hill contacted the State Health Planning Agency — the state agency responsible at the time for administering the state certificate of need program — about how the requirements of the CON Act would affect this proposal. Windy Hill's communication to the agency has been lost, and its precise contents are unknown. . . . On June 12, 1996, the State Health Planning Agency ["SHPA"] wrote in a letter to Windy Hill's counsel that the hospital would not need a CON to convert to a long-term care hospital. The agency wrote:

> After considering all of the information made available to the Agency, please be informed that Windy Hill will not need to obtain CON approval in order to implement its proposal as it was described to the Agency. In particular, it should be noted that the Agency is of the opinion that the operation of Windy Hill as a long-term acute care hospital is within the original scope of Windy Hill's CON authorization as a general acute care hospital.

Relying on the agency's letter, Windy Hill transitioned to long-term care.[5] On July 1, 1997, it obtained certification as a long-term care

---

[5] Importantly, we noted in *Emory I* that, as a result of the State Health Planning Agency's letter, "Windy Hill surrendered its original permit, which had authorized

hospital from the Department of Human Resources, the state agency responsible at the time for hospital licensing. Ever since, Windy Hill has operated as a long-term care hospital.

(Footnote omitted.) 318 Ga. at 172 (1) (b) (i).

> (b) *Litigation Background.* In 2019,
>
> Windy Hill contemplated a transition back to short-term care. As part of the transition process, Windy Hill asked the [DCH] to confirm that, if the hospital relinquished its Medicare certification as a long-term care hospital, its beds would automatically "revert" to their pre-1996 status as acute short-stay beds. In other words, Windy Hill hoped to confirm that it could transition to short-term care without applying for and obtaining a new CON.

*Emory II*, 318 Ga. at 173 (1) (b) (ii). Emory objected to Windy Hill's application, and

> [t]he [DCH] denied Windy Hill's request. At three separate levels of administrative review, the [DCH] concluded that Windy Hill was not eligible for the automatic reversion described in its rules because the hospital converted to long-term care in 1996 without having been "approved through a CON process." The [DCH]'s initial decision found simply that the hospital's 1996 conversion was "not subject to prior CON review and approval." On administrative appeal, a hearing

---

[it] to operate as a 'General Hospital,' and the SHPA marked the permit as 'Void.'" 364 Ga. App. at 584 (1).

officer found that the State Health Planning Agency's 1996 letter —
which advised Windy Hill that it would "not need to obtain CON
approval" to convert to long-term care — was not a "CON process,"
but rather a "determination that Windy Hill did not need a CON to
convert to an LTCH [long-term care hospital]" at that time. The hearing
officer reasoned that Windy Hill "permissibly avoided rather than
underwent, much less was 'approved through,' a CON process." And
in the final level of administrative review, a designee of the [DCH]'s
Commissioner agreed with the hearing officer that the hospital
"permissibly avoided," rather than went through, the CON approval
process. The upshot of the agency's decision was that Windy Hill would
need to obtain a new CON to operate as a new short-term care hospital.

(Punctuation omitted.) Id. at 173-174 (1) (b) (ii). On judicial review in the Superior

Court of Cobb County, the superior court

reversed the final agency decision. The court found that Windy Hill had
"engaged in 'the CON process' prior to its 1997 conversion to LTCH
status by seeking a determination from SHPA ([the DCH's] predecessor
agency) regarding its CON authority to operate long-term beds." The
superior court also concluded that the [DCH]'s decision violated Windy
Hill's constitutional rights, because the hospital had acquired a "vested
right to provide both short-stay and long-term medical surgical care"
that could not be impaired by later-enacted legislation.

7

*Emory II*, 318 Ga. at 174 (1) (b) (iii). As outlined above, we reversed the superior court's judgment in *Emory I*, and the Supreme Court in *Emory II* vacated our opinion and remanded the case to this Court for further proceedings.

At the outset, we emphasize that "on appeal to this Court, our duty is not to review whether the record supports the superior court's decision but whether the record supports the final decision of the administrative agency." (Citation and punctuation omitted.) *Ga. Dept. of Community Health v. Satilla Health Svcs.*, 266 Ga. App. 880, 885 (1) (c) (598 SE2d 514) (2004). To that end, we may reverse or modify the agency's decision only if the decision is:

> (1) [i]n violation of constitutional or statutory provisions;
>
> (2) [i]n excess of the statutory authority of the department;
>
> (3) [m]ade upon unlawful procedures;
>
> (4) [a]ffected by other error of law;
>
> (5) [n]ot supported by substantial evidence, which shall mean that the record does not contain such relevant evidence as a reasonable mind might accept as adequate to support such findings, inferences, conclusions, or decisions, which such evidentiary

standard shall be in excess of the "any evidence" standard contained in other statutory provisions; or

(6) [a]rbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

OCGA § 31-6-44.1 (a) (2024).

*Case No. A22A0111*

2. In its original appeal in this Court, Emory argued that the superior court erred in finding that Windy Hill went through the CON process in 1996, when it converted to a long-term care hospital from a short-stay acute care hospital, and that it could, therefore, take advantage of certain CON reversion procedures to return to operations as a short-stay acute care hospital without a new CON. Emory further asserted that the superior court erroneously found that a long-term care hospital and a short-stay acute care hospital are legally the same "clinical health service," see OCGA § 31-6-2 (8), such that a new CON is not required to switch from one category of hospital to the other.

In *Emory I*, we concluded that "the superior court erred in reversing the DCH commissioner's decision and in finding that 'Windy Hill is entitled to automatic

9

reversion of its beds to short-stay status under Ga. Comp. R. & Regs., r. 111-2-2-.36 (2) (d).'" (Punctuation omitted.) 364 Ga. App. at 592 (2) (b) (iii). We also determined that "the DCH commissioner was authorized to find that Windy Hill's proposed conversion constituted a 'new institutional health service' that required prior CON review and approval." Id. at 595-596 (3). In reaching those conclusions, we relied upon several of our cases that largely deferred to the DCH's interpretation of its CON Rules and Regulations. As a result, it was not apparent that our analysis limited the deference that had been traditionally afforded the DCH in this arena. Our Supreme Court remanded to this Court the issue of whether "Windy Hill had 'been *approved through the Certificate of Need process*' to convert its short-stay beds to long-term care, such that certain [DCH] rules would allow the hospital to transition back to short-term care." (Emphasis in original.) *Emory II*, 318 Ga. at 184 (3).

After performing the analysis prescribed by *Emory II*, we reach the same conclusion we reached in *Emory I* and again hold that Windy Hill is not a hospital that has been "approved through the Certificate of Need process" to allow its long-term care beds to "revert" to short-stay acute care beds, and that it must obtain a new CON to operate a short-stay acute care hospital.

(a) *Legal Framework*. "[O]ur long-held rule is that courts may defer to an agency's construction of its own rule only if its meaning is ambiguous, and once the traditional tools of construction are applied, few statutes or regulations are truly ambiguous[.]" (Citation, punctuation, and footnote omitted.) *Emory II*, 318 Ga. at 183 (3). To that end, we first

> construe the relevant text: consider the regulatory text in light of its full legal and historical context and otherwise apply the traditional tools of statutory construction to figure out what the rule means. If this work produces a clear meaning — and as we said in *Barrow* [305 Ga. at 804 (2)], it probably will — that is the end of the matter. If, on the other hand, a genuine ambiguity remains after all tools of construction are exhausted — that is, the court is left with two (or more) equally reasonable interpretations — [we] must then consider whether to defer to the agency's interpretation of the rule.

(Citation, punctuation, and footnote omitted.) Id. at 183-184 (3). For the following reasons, we conclude that the plain language of the relevant rules, regulations, and statutes confirms that Windy Hill was required to obtain a new certificate of need and that it is not a hospital that has been "*approved through the Certificate of Need process*. . . ." (Emphasis in original.) Id. at 184 (3).

(b) *Analysis*. To begin, we note that when examining statutory provisions, "we must afford the statutory text its plain and ordinary meaning, we must view the statutory text in the context in which it appears, and we must read the statutory text in its most natural and reasonable way, as an ordinary speaker of the English language would." (Citation and punctuation omitted.) *Smith v. Northside Hosp.*, 302 Ga. 517, 521 (1) (807 SE2d 909) (2017). "Similarly, in construing agency regulations, we employ the basic rules of statutory construction and look to the plain meaning of the regulation to determine its meaning." (Citation and punctuation omitted.) *Cobb Hosp. v. Dept. of Community Health*, 349 Ga. App. 452, 459-460 (1) (c) (ii) (825 SE2d 886) (2019), reversed in part by 307 Ga. 578 (837 SE2d 371) (2019). See also *Emory II*, 318 Ga. at 183 (3).

As we noted above, our consideration of this appeal implicates two questions: (1) whether Windy Hill was required, under OCGA § 31-6-40 (a) to obtain a new certificate of need to operate as a short-term acute care hospital; and (2) whether Windy Hill had been "approved through the certificate of need process" such that its long-term care beds would "revert" to short-stay acute care beds upon its decertification as a long-term care hospital. For the following reasons, we conclude

12

that the relevant provisions of the CON Act and the DCH's CON Rules and Regulations are not ambiguous and, therefore, we address each question in turn without affording any deference to the DCH's interpretation of its own rules and regulations.

(i) *Requirement of a Certificate of Need.* In *Emory I*, Emory argued that "the superior court erred in finding that a long-term care hospital and a short-stay general acute care hospital are legally the same 'clinical health service,' see OCGA § 31-6-2 (8), and that a new CON is not required to switch from one category of hospital to the other." 364 Ga. App. at 592 (3). The heart of Emory's argument is that Windy Hill, in seeking to "revert" to a short-stay acute care hospital, was required to obtain a new CON because it would be offering "[c]linical health services . . . which were not offered on a regular basis in or through such health care facility within the 12 month period prior to the time such services would be offered[.]" OCGA § 31-6-40 (a) (5).

In large part, we addressed this issue in Division 3 of *Emory I*. See 364 Ga. App. at 592-596 (3). There, we concluded that the superior court erred in reversing the DCH agency decision because the court equated the definitions of "short stay hospital beds" and long-term care beds "to hold that Windy Hill did not need prior CON

approval" under OCGA § 31-6-40 (a). Id. at 596 (3). This specific issue was not included in the Supreme Court's grant of certiorari. But see *Shadix v. Carroll County*, 274 Ga. 560, 563 (1) (554 SE2d 465) (2001) ("Whenever this Court considers only a portion of a Court of Appeals' opinion and reverses, it is for the Court of Appeals to determine on remand whether the portions of its earlier opinion that were not considered by this Court are consistent with this Court's ruling."). Accordingly, we consider anew Emory's arguments in view of the analysis required by *Barrow*. See *Emory II*, 318 Ga. at 183-185 (3).

(A) *Relevant Rules & Regulations*. First among the provisions relevant to this case is OCGA § 31-6-40 (a), which provides that

> [o]n and after July 1, 2008, any new institutional health service shall be required to obtain a certificate of need pursuant to this chapter. New institutional health services include:
>
> ...
>
> (5) Clinical health services which are offered in or through a health care facility, which were not offered on a regular basis in or through such health care facility within the 12 month period prior to the time such services would be offered[.]

To that end, "[a]ny person proposing to develop or offer a new institutional health service or health care facility shall, before commencing such activity, submit a letter of intent and *an application* to the department and obtain a certificate of need in the manner provided in this chapter unless such activity is excluded from the scope of this chapter." (Emphasis supplied.) OCGA § 31-6-40 (b). An exception to this requirement is that "[a]ny person who had a valid exemption granted or approved by the former Health Planning Agency or the department prior to July 1, 2008, shall not be required to obtain a certificate of need *in order to continue to offer those previously offered services*." (Emphasis supplied.) OCGA § 31-6-40 (c) (1).

To provide for the administration of the CON program, the General Assembly authorized the DCH to promulgate rules in support of its functions. See OCGA § 31-6-21 (a) (2024). In that vein, and as is relevant to this appeal, Ga. Comp. R. & Regs. r. 111-2-2-.20 (1) (d) provides that

> a hospital that has been *approved through the Certificate of Need process* to use a certain number of short-stay hospital beds for long-term acute care (LTAC) beds shall have such LTAC beds removed from the official inventory of available short-stay beds once the LTAC is certified by Medicare; provided, however, that *such beds will revert to the hospital's*

*official inventory of available short-stay beds at any point that the LTAC ceases operation or is no longer certified by Medicare.*

(Emphasis supplied.) Similarly, Ga. Comp. R. & Regs. r. 111-2-2-.36 (2) (d) provides:

a hospital that has been *approved through the Certificate of Need process* to use all of its short-stay beds for a Freestanding LTCH shall have such beds removed from the official inventory of available short-stay beds when the LTCH is certified by Medicare; provided, however, that *the hospital's beds will revert to the official inventory of available short-stay beds at any point that the facility ceases to be certified by Medicare as an LTCH.*

(Emphasis supplied.) Accordingly, these provisions, which became effective in 2005, are available only to those hospitals that have been "approved through the certificate of need process" to use short-stay hospital beds in a long-term care hospital.

(B) *Application of Relevant Rules & Regulations to this Case.* Here, Windy Hill opened in the 1970s as a general acute care hospital — at a time when CONs were unknown — and was grandfathered under the CON Act in 1979 — such that, again, no CON was necessary or issued. For the next 17 years, Windy Hill operated as a general acute care hospital until, in 1996, it sought permission to operate as a long-term care hospital. The predecessor to the DCH permitted Windy Hill's conversion, and Windy Hill acted accordingly:

16

Windy Hill surrendered its original permit, which had authorized Windy Hill to operate as a "General Hospital," and the SHPA marked the permit as "Void." [Windy Hill] obtained a new permit in 1997 authorizing it to operate as a "Specialized Long Term Acute Care Hospital," and it began operating as a long-term care hospital. Windy Hill initially had 42 beds, but in 2007, [Windy Hill] obtained a new CON to renovate the hospital in order to add five additional beds. Thereafter, although [Windy Hill] only operated 47 beds . . ., the hospital retained a licensed bed capacity of 115 beds.

(Footnote omitted.) *Emory I*, 364 Ga. App. at 584-585 (1). Windy Hill continued to operate as a long-term care hospital until 2019, when it sought to "revert" back to a short-stay acute care hospital.

In view of the Supreme Court's statements relative to *Barrow* in *Emory II*, see 318 Ga. at 183 (3), we have reconsidered our analysis in Division 3 of *Emory I*, paying particular attention to the definitions of "clinical health services,"[6] "long term care

---

[6] See OCGA § 31-6-2 (8) ("'Clinical health services' means diagnostic, treatment, or rehabilitative services provided in a health care facility and includes, but is not limited to, the following: radiology and diagnostic imaging, such as magnetic resonance imaging and positron emission tomography (PET); radiation therapy; biliary lithotripsy; surgery; intensive care; coronary care; pediatrics; gynecology; obstetrics; general medical care; medical-surgical care; inpatient nursing care, whether intermediate, skilled, or extended care; cardiac catheterization; open heart surgery; inpatient rehabilitation; and alcohol, drug abuse, and mental health services.").

hospital," and "short stay hospital" cited therein.[7] After reconsideration of these

factors through the lens of *Barrow* and *Emory II*, we hold that "new institutional health

---

[7] We previously noted that

[a] "short stay hospital" or "hospital" is defined as a facility with an average length of stay of less than thirty (30) days. Ga. Comp. R. & Regs., r. 111-2-2-.20 (2) (n). "Long Term Care Hospital" or "LTCH" or "Long Term Acute Care Hospital" or "LTACH" means a hospital that is classified as a long term hospital by the Medicare program pursuant to 42 CFR 412.23 (e). These hospitals typically provide extended medical and rehabilitative care for patients who are clinically complex and may suffer from multiple acute or chronic conditions. Services typically include comprehensive rehabilitation, respiratory therapy, head trauma treatment, and pain management. Ga. Comp. R. & Regs., r. 111-2-2-.36 (2) (d). Moreover, according to federal regulations, to be so classified, long-term care hospitals "must have an average Medicare inpatient length of stay of greater than 25 days (which includes all covered and noncovered days of stay of Medicare patients)." 42 CFR 412.23 (e) (2) (i).

(Citations, punctuation, and emphasis omitted.) *Emory I*, 364 Ga. App. at 594-595 (3). "That there may be a minimal level of overlap between the two categories does not alter the fact that the categories are defined differently, evaluated differently, reported differently, and provide different levels of care." (Footnote omitted.) Id. at 595 (3).

service," specifically as that phrase is explained in OCGA § 31-6-40 (a), is not ambiguous and again conclude that

> the DCH commissioner was authorized to find that Windy Hill's proposed conversion constituted a "new institutional health service" that required prior CON review and approval. See OCGA § 31-6-40 (a) (5) (stating that a new institutional health service includes "[c]linical health services which are offered in or through a health care facility, which were not offered on a regular basis in or through such health care facility within the 12 month period prior to the time such services would be offered").[8]

(Footnote omitted.) *Emory I*, 364 Ga. App. at 595-596 (3).

(ii) "*Approved Through the Certificate of Need Process*." In contrast, neither the CON Act nor the DCH's Rules and Regulations wholly define "approved through the certificate of need process[,]" although certain critical elements of that phrase are defined by the CON Act. Therefore, to fill any definitional gaps, we look to

---

[8] To the extent that "clinical health services" could be read to include either short-stay acute care or long-term care, as neither is included in OCGA § 31-6-40 (a) (5), such a reading does not render that provision ambiguous in this instance because, as we have pointed out, the CON Rules and Regulations define both levels of care and it is apparent from those definitions that the care services are different. See n. 7, supra.

19

dictionaries for guidance as needed. See *Kelley v. Cincinnati Ins. Co.*, 364 Ga. App. 612, 617 (1) (c) (i) (876 SE2d 51) (2022).

(A) "*Approved.*" "Approve" is not defined by the CON Act, but it is "a phrase of general usage and must be given its ordinary meaning. See OCGA § 1-3-1 (b)." *Abdel-Samed v. Dailey*, 294 Ga. 758, 763 (2) (755 SE2d 805) (2014). Dictionaries primarily define "approve" in two generic ways: (1) "to have or express a favorable opinion of," https://www.merriam-webster.com/dictionary/approve (last visited September 2, 2024) and (2) "to accept as satisfactory[;] to give formal or official sanction to: RATIFY." Id. The first example suggests a colloquial or general expression of agreement, while the second connotes a more formal or studied confirmation.

For the following reasons, we conclude that the second, more formal definition of "approve" applies to the CON Act.[9] "In construing language used in a statute, . . . we also must consider the context in which a phrase is used and the legislative intent

---

[9] Similar definitions for "approve" have included "[t]o consent to officially or formally; confirm or sanction," The American Heritage Dictionary of the English Language, 91 (3d ed. 1992); and "to express often formally agreement with and support of or commendation of as meeting a standard." Webster's Third New International Dictionary, 106 (1981).

behind enactment of the statute." *Abdel-Samed*, 294 Ga. at 763 (2). In the context of the CON Act, "approve" is used to describe the disposition of a hospital's participation in "the certificate of need process[.]" See, e.g., Ga. Comp. R. & Regs. rr. 111-2-2-.20 (1) (d) & 111-2-2-.36 (2) (d) We define "the certificate of need process" in greater detail below, but it is enough to say here that it is a "highly specialized" review in which "[b]oth the hospital seeking a CON and the hospitals opposing it gather and organize vast amounts of data, expert testimony, and other evidence which are presented to the agency staff, which then interprets and synthesizes the evidence and applies it to the agency rules." (Citation and punctuation omitted.) *Cobb Hosp.*, 349 Ga. App. at 460-461 (1) (c) (ii). See also *Palmyra Park Hosp. v. Phoebe Sumter Med. Center*, 310 Ga. App. 487, 491 (1) (714 SE2d 71) (2011) (noting that the CON process "requires a particularly high level of expertise and specialization"). These descriptions necessarily imply a heightened level of approval beyond mere general agreement.

Moreover, the formal definition we recognize is consistent with the General Assembly's codified legislative intent, which we cannot ignore. See *Abdel-Samed*, 294 Ga. at 763 (2). To that end, OCGA § 31-6-1 provides that

[t]he policy of this state and the purposes of this chapter are to ensure access to quality health care services and to ensure that health care services and facilities are developed in an orderly and economical manner and are made available to all citizens and that only those health care services found to be in the public interest shall be provided in this state. To achieve such public policy and purposes, it is essential that appropriate health planning activities be undertaken and implemented and that a system of mandatory review of new institutional health services be provided. Health care services and facilities should be provided in a manner that avoids unnecessary duplication of services, that is cost effective, that provides quality health care services, and that is compatible with the health care needs of the various areas and populations of the state.

Accordingly, we conclude that, when it is read in its most natural and reasonable way, "approved," as it is used in the context of the CON Act and the DCH's CON Rules and Regulations, means "to give formal or official sanction to: ratify."

(B) "*Through.*" "Through" is "used as a function word to indicate acceptance or approval especially by an official body." https://www.merriam-webster.com/dictionary/through (last visited September 2, 2024).[10]

---

[10] See also www.dictionary.com/browse/through (last visited July 8, 2024) ("in at the first step of a process, treatment, or method of handling, passing through

(C) "*The certificate of need process.*" The CON Act defines "certificate of need" as "an official finding by the [DCH], evidenced by certification issued pursuant to an application, that the action proposed in the application satisfies and complies with the criteria contained in this chapter and rules promulgated pursuant hereto." OCGA § 31-6-2 (6). In turn, "[a]pplication" is defined as "a written request for a certificate of need made to the [DCH], containing such documentation and information as the [DCH] may require." OCGA § 31-6-2 (2). ]

In contrast, "[p]rocess" is not defined by the CON Act or the DCH Rules and Regulations, but is generally defined as "a series of actions or operations conducing to an end[.]" https://www.merriam-webster.com/dictionary/process (last visited September 2, 2024).[11] Contextually, we have described the "CON process" as "a system of mandatory review requiring that, before new institutional health services

---

subsequent steps or stages in order, and finished, accepted, or out of the last step or stage"); Webster's Third New International Dictionary, 2384 (1981) ("used as a function word to indicate satisfaction or completion of the requirements for acceptance or approval by a group or official body").

[11] See also www.dictionary.com/browse/process (last visited July 8, 2024) ("a systematic series of actions directed to some end"); Webster's Third New International Dictionary, 1808 (1981) ("a particular method or system of doing something, producing something, or accomplishing a specific result").

and facilities can be developed, the developer must apply for and receive a CON from the DCH." *ASMC v. Northside Hosp.*, 344 Ga. App. 576, 577 (810 SE2d 663) (2018). As part of its evaluation,

> [t]he DCH reviews *CON applications* and issues decisions granting or denying a CON under statutory considerations in OCGA § 31-6-42 and under general and specific review considerations in rules and regulations promulgated by the DCH as set forth in Ga. Comp. R. & Regs. (rule or rules) 111-2-1-.01 and 111-2-2-.01 through 111-2-2-.43. Under OCGA § 31-6-42 (a), "[t]he [DCH] shall issue a certificate of need to each applicant whose application is consistent with the [considerations set forth in the statute] and such rules deemed applicable to a project," including the establishment of a need for the services.

(Citation and footnote omitted; emphasis supplied.) Id. And as we have noted,

> [t]he DCH rules promulgated to administer the program are detailed and lengthy. See, e.g., Ga. Comp. R. & Regs. r. 111-2-2-.07, which describes the review procedures for CON applications. *Both the hospital seeking a CON and the hospitals opposing it gather and organize vast amounts of data, expert testimony, and other evidence which are presented to the agency staff, which then interprets and synthesizes the evidence and applies it to the agency rules.* See OCGA § 31-6-43. . . .
>
> Further administrative review is also highly specialized. The hearing officer who reviews the initial DCH staff decision is one of five members

of the CON Panel, all of whom are appointed by the Governor and are attorneys "who are familiar with the health care industry but who do not have a financial interest in or represent or have any compensation arrangement with any health care facility." OCGA § 31-6-44 (a), (b).

(Punctuation omitted; emphasis supplied.) *Palmyra Park Hosp.*, 310 Ga. App. at 491-492 (1); see also Ga. Comp. R. & Regs. r. 111-2-2-.20 (3) (describing calculations and standards necessary for evaluating short-stay hospital CON applications); Ga. Comp. R. & Regs. r. 111-2-2-.36 (3) (same, as required for long-term care hospitals).[12]

Therefore, to enforce Georgia's stated policy directives, the "CON process" requires the DCH to thoroughly evaluate a party's application to ensure that "[h]ealth care services and facilities [are] provided in a manner that avoids unnecessary duplication of services, that is cost effective, that provides quality health care services, and that is compatible with the health care needs of the various areas and populations of the state." OCGA § 31-6-1.

(c) *Conclusion*. At a bare minimum, then, review under the "CON process" first requires an application. See OCGA §§ 31-6-2 (2), 31-6-43 (b) (2024). Here, the

---

[12] Collectively, these descriptions support the definition of "approve" we adopted supra.

parties have not included a record citation to, and our review of the record has not revealed, any such application filed by Windy Hill for its evaluation, as either a short-stay general acute care hospital or a long-term care hospital, at any point in its history prior to the 2019 application at issue in this case.[13] And even were we to generously construe Windy Hill's 1996 letter to SHPA in which it sought to operate Windy Hill as a long-term care hospital as an "application," there is no ensuing review in which "[b]oth the hospital seeking a CON and the hospitals opposing it gather and organize vast amounts of data, expert testimony, and other evidence which are presented to the agency staff, which then interprets and synthesizes the evidence and applies it to the agency rules." *Palmyra Park Hosp.*, 310 Ga. App. at 492 (1). To the contrary, SHPA stated in 1996 that Windy Hill need not participate in the CON process at that time. This cursory statement hardly passes as the equivalent of the "detailed and lengthy" review we have outlined above, see id. at 491 (1), which would satisfy the unambiguous requirement that a hospital be "approved through the certificate of need process."

_____

[13] Indeed, the record *does* include at least two prior certificate of need evaluations for Windy Hill — one for a change in ownership of Windy Hill in 1993 and one for the renovation of the third floor of its facility "to set-up and staff thirteen (13) additional long-term acute care . . . beds. . . ."

Because we conclude that Windy Hill has not been "approved through the certificate of need process," it necessarily follows that Windy Hill is not entitled to the benefits of the "reversion exception" in either Ga. Comp. R. & Regs. r. 111-2-2-.20 (1) (d) or 111-2-2-.36 (2) (d). As a result, we conclude that the record supports the DCH commissioner's decision that Windy Hill's proposed conversion from a long-term care hospital to a short-stay general acute care hospital "would require prior CON review and approval." Therefore, in the absence of any basis codified in OCGA § 31-6-44.1, we further conclude that the superior court erred in reversing the DCH commissioner's decision and in finding that "Windy Hill is entitled to automatic reversion of its beds to short-stay status under [Ga. Comp. R. & Regs. r.] 111-2-2-.36 (2) (d)."

3. *Existence of a Private Right.* Next, Emory asserted in *Emory I* that the superior court erred in finding that Windy Hill had a "vested right to provide both long-term and short-stay medical-surgical care . . . while retaining its status as a general acute care hospital" and that reversing the DCH commissioner's decision "avoids an unconstitutional result." The Supreme Court later concluded that "a CON's authorization to operate as a general acute care hospital confers . . . private rights on

27

the recipient . . . because the right to use one's property in a particular way (here, as a particular kind of hospital) is an individual property right with roots in the common law. . . ." *Emory II*, 318 Ga. at 179 (2) (b).[14] For the following reasons, we conclude that Windy Hill did not acquire a vested right to operate the hospital as a short-stay acute care hospital and that, as a result, the DCH did not violate any right held by Windy Hill by requiring it to obtain a new CON to convert its beds to short-stay acute care from long-term care.

"Our Constitution forbids applying laws retroactively when doing so would impair vested rights." (Punctuation omitted.) *Emory II*, 318 Ga. at 176 (2) (a). "[T]he term vested rights means interests which it is proper for the state to recognize and protect and of which the individual cannot be deprived arbitrarily without injustice." (Citation and punctuation omitted.) *Deal*, 294 Ga. at 177 (2) (a); see also *Recycle & Recover v. Ga. Bd. of Natural Resources*, 266 Ga. 253, 254 (2) (466 SE2d 197) (1996). Vested rights must be private rights, see *Deal*, 294 Ga. at 181 (2) (a), and such interests only become "vested when there is an immediate right of enjoyment or a

---

[14] Notably, the Supreme Court explicitly stated "[t]hat . . . is all we decide here." *Emory II*, 318 Ga. at 183 (2) (c). In other words, the Court reached no conclusion as to whether Windy Hill actually secured a vested right to operate Windy Hill in a given manner — only that such a right generally exists.

present fixed right of future enjoyment." (Citation and punctuation omitted.) *Rose v. Waldrip*, 316 Ga. App. 812, 817 (1) (b) (i) (730 SE2d 529) (2012).

As we noted in *Emory I*,

the superior court tacitly found that Windy Hill had a vested right to operate as a short-stay general acute care hospital based upon the 1996 letter from SHPA. As a result, the superior court concluded that

> [e]ven if "short-stay beds" and "long-term beds" were distinct clinical health services, [the] DCH cannot interpret its later-adopted rules to retroactively take away Windy Hill's vested right to provide both short-stay and long-term medical-surgical care. As reflected by the 1996 [SHPA letter], Windy Hill had a right to provide [long-term care hospital] services while retaining its status as a general acute care hospital. That right — expressly recognized in a ruling from the state CON agency — has never been relinquished. Thus, even if [the] DCH's subsequent adoption of separate rules for Short-Stay Hospital Beds and Long Term Care Hospitals created distinct clinical health services, Windy Hill had already vested its right to offer long-term beds while retaining its general acute care CON authorization, including offering medical-surgical care.

(Footnote omitted.) 364 Ga. App. at 596-597 (4).

29

Based upon the following factors, we conclude that the DCH's requirement that Windy Hill obtain a new CON to convert from a long-term care hospital to a short-stay acute care hospital did not violate Windy Hill's constitutional rights because Windy Hill did not have a vested right to operate a short-stay acute care hospital in 1997 (when it received a permit to operate a long-term care hospital), 2005 (when the distinction between "short-stay acute care" and "long-term care" was formally recognized by the DCH's Rules and Regulations), or 2019 (when it sought to "revert" to a short-stay acute care hospital).

As we have noted, Windy Hill opened in the 1970s as a short-stay acute care hospital, was grandfathered as a short-stay acute care hospital when the CON Act became effective in 1979, and remained a short-stay acute care hospital until 1996. Windy Hill acknowledged as much, stating in its 2019 CON application that "[s]ince its founding in 1973, WellStar Windy Hill had operated as a general acute care short-stay hospital" until 1996.

In 1996, Windy Hill requested to operate "a long-term acute care hospital pursuant to 42 CFR 412.23 (e) (1) and (2)." To that end, Windy Hill surrendered its original permit, which had authorized Windy Hill to operate as a "General Hospital,"

30

and the SHPA marked the permit as "Void." Windy Hill then obtained a new permit in 1997 to operate as a "Specialized Long Term Acute Care Hospital," and it so operated as a long-term care hospital for the next 23 years.[15] In the meantime, the formal distinction between short-stay acute care general hospitals and long-term care hospitals was highlighted by the promulgation of Ga. Comp. R. & Regs., rr. 111-2-2-.20 ("Specific Review Considerations for Short-Stay General Hospital Beds") and 111-2-2-.36 ("Specific Review Considerations for Long Term Care Hospitals") in 2005, when Windy Hill was operating as a long-term care hospital. In short, between 1997 and 2019, nothing about Windy Hill suggested it was anything other than what it asked to be in 1996 — a long-term care hospital.

As these factors relate to our current inquiry, to the extent Windy Hill acquired a vested right at all as a result of the 1996 letter, it obtained the right to operate as a long-term care hospital. See Ga. Comp. R. & Regs. r. 111-2-2-.10 (1) (a)

---

[15] During that time, in its Annual Hospital Questionnaire sent to the DCH each year from 2015 to 2018 inclusive, Windy Hill noted that it maintained a permit to operate a "Specialized Long-Term Acute Care Hospital" and that it had no emergency room or any beds other than long-term care hospital beds — including no short-stay hospital beds. And according to Windy Hill's own evidence, it maintained 47 long-term care hospital beds, and only long-term care beds, when it sought to "revert" to a short-stay acute care hospital in 2019.

("Determinations are conclusions of the Department that are based on specific facts and are limited to the specific issues addressed in the request for determination, as applicable. Therefore, the conclusions of a specific determination shall have no binding precedent in relation to parties not subject to the request and to other facts or factual situations that are not presented in the request."). That right is evidenced by the permit it received in 1997, authorizing it to operate as a "Specialized Long Term Acute Care Hospital." Stated differently, Windy Hill's right vested when it secured "an immediate right of enjoyment or a present fixed right of future enjoyment." (Citation and punctuation omitted.) *Rose*, 316 Ga. App. at 817 (1) (b) (i).[16] Accordingly, the 2005 enactment of the DCH Rules and Regulations did not retroactively impact Windy Hill's vested rights in violation of the Georgia constitution because the only vested right Windy Hill attained was to operate as a long-term care

---

[16] Importantly, the 1997 permit was not in addition to, or in conjunction with, Windy Hill's pre-1996 authorization to operate as a general hospital; rather, the 1997 permit only issued *after* Windy Hill returned its former permit, which the SHPA then marked as "Void."

hospital — which it was. See *Emory II*, 318 Ga. at 176 (2) (a); *Deal*, 294 Ga. at 177 (2) (a).[17]

---

[17] We repeat our concern from *Emory I* that

concluding that a facility is entitled to switch back and forth between operating short-stay and long-term beds undermines the purpose of the CON program. As a matter of express public policy, OCGA § 31-6-1 requires the DCH to ensure that health care services and facilities are provided in a manner that is cost-effective and that avoids the unnecessary duplication of services. If Windy Hill, or any other facility, retains a purported right to unilaterally change the nature of the services its offers, the DCH would be precluded from fulfilling its legislatively-mandated regulatory role, and the codified public policy underlying the CON process would be rendered meaningless. We cannot read the relevant rules and statutes in such a way. See generally *Langley v. Langley*, 279 Ga. 374, 376 (1) (613 SE2d 614) (2005) (holding that, in case where enforcement of an agreement was a matter of public policy, "considerations of public policy cannot be ignored").

364 Ga. App. at 599 (4).

Having failed to demonstrate a vested right to operate as a short-stay general acute care hospital, it necessarily follows that Windy HIll cannot show a violation of its constitutional rights. The superior court erred in holding otherwise.[18]

*Case No. A22A0112*

4. In Case No. A22A0112, the DCH asserts that the superior court: (1) relied upon an unreasonable interpretation of the facts; (2) misinterpreted the rules governing CONs; (3) misinterpreted the term "clinical health services"; (4) erroneously found that reversing the DCH's determination avoids an unconstitutional result; and (5) erred in finding that the DCH's determination was arbitrary and capricious.

However, in view of our decision in Case No. A22A0111 supra, we again dismiss Case No. A22A0112 as moot for the reasons stated in *Emory I*. See 364 Ga. App. at 599-600 (5); see also *Turner Outdoor Advertising v. Werco*, 194 Ga. App. 14, 15 (2) (389 SE2d 778) (1989).

---

[18] It is still unnecessary for us to consider "Emory's remaining enumeration that the superior court failed to address its argument that [Windy Hill]'s proposal resulted in a new short-stay general acute care hospital without obtaining a new CON. See OCGA § 31-6-40 (a) (1)."

In sum, after analyzing this matter in accordance with the Supreme Court's mandate in *Emory II*, we conclude that the DCH correctly determined that Windy Hill is not entitled to have its long-term care beds "revert" to short-stay acute care beds and that it must obtain approval through the CON process to operate a short-stay acute care hospital. Moreover, we again conclude that Windy Hill did not have a vested right to operate a short-stay acute care hospital following its 1996 conversion to, and subsequent permitted operation as, a long-term care hospital. As a result, the DCH did not violate a vested right because the only vested right Windy Hill arguably acquired and retained was to operate a long-term care hospital. Therefore, we reverse the superior court's judgment in Case No. A22A0111 and dismiss Case No. A22A0112 as moot.

*Judgment reversed in Case No. A22A0111. Appeal dismissed as moot in Case No. A22A0112. Barnes, P. J., and Brown, J., concur.*